# UNITED STATES DISTRICT COURT
for the
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| BECK'S SUPERIOR HYBRIDS, INC., <br><br> Plaintiff, <br> v. <br><br> HYDROSWING NORTH AMERICA, INC., and MARSHAL PARKER, <br><br> Defendants. | Civil Action No.: 1:16-cv-1699 |

## COMPLAINT

Plaintiff Beck's Superior Hybrids, Inc. ("Beck's"), for its Complaint against defendants Hydroswing North America, Inc. ("Hydroswing") and Marshal Parker ("Parker"), states as follows:

## INTRODUCTION

1. In February 2015, Hydroswing agreed to fabricate, deliver, and install a 110 feet by 28 feet glass and steel airplane hangar door at the Beck's hangar at Indianapolis Executive Airport, Zionsville, Indiana. The parties signed Hydroswing's standard quote sheet, which obligated Beck's to pay $381,000 for an installed and functioning hydraulic hangar door. Beck's initially paid one-half of the contract price, $190,500.

2. Hydroswing failed to timely perform its delivery obligations. Hydroswing's president, Marshal Parker, initially promised the door then entire process from "start to finish" would take 8 weeks or less, but the first firm promise of a real delivery date was November 9, 2015. Beck's made arrangements with the airport and obtained the equipment Hydroswing required for install. However, Hydroswing failed to deliver the

door in November 2015 and then failed to return phone calls and emails inquiring as to why. Hydroswing's glass subcontractor delivered glass for the door in November 2015—on schedule with the anticipated November delivery—but because no door had arrived, the glass was placed outside the hangar in a stack. With no door and winter approaching, Beck's constructed a temporary wall at considerable cost to protect the hangar from the elements.

3. Hydroswing finally delivered the door frame skeleton in sections on February 15, 2016, more than one year after the original quote was signed. However, as of June 27, 2016, Hydroswing had not delivered the hydraulics components, cylinders, fasteners, and other parts necessary for installation of the door.

4. Hydroswing also failed to perform its installation obligation. Hydroswing promised that installation would occur shortly after delivery. Installation was first promised in November 2015, then in March 2016 following delivery. When nothing happened in March or April 2016, Hydroswing started promising installation would begin in May 2016, and then in June 2016.

5. After multiple failed attempts to obtain an installation completion date, Beck's notified Hydroswing on April 28, 2016 that it would consider Hydroswing in breach of its obligations if Hydroswing failed to complete the project by May 22, 2016. Hydroswing did not complete the project—or even start installation work—by May 22, 2016. Beck's gave Hydroswing another chance to cure this breach by allowing installation to begin on May 31, 2016. When Hydroswing failed to show up on May 31, 2016, Beck's had no choice but to find an alternate supplier for the door. To date, Beck's has paid Hydroswing $332,800 but has received nothing in return except for an unfinished door frame in pieces

and a pile of glass without the framing necessary for install. Among other relief requested, Beck's seeks a refund of the amount paid to Hydroswing.

## THE PARTIES, JURISDICTION AND VENUE

6. Defendant Hydroswing is a corporation under the laws of California. Its registered business address is 167 13th Street, Del Mar, California, 92014. Its principal place of business is 2100 Palomar Airport Road, Suite 210, Carlsbad, California 92011.

7. Defendant Marshal Parker is believed to be a citizen of the United Kingdom that resides in California. His address is believed to be Pinfold Cottage, Harbour Lane Salwick, Preston PR4 0ZJ, England and/or 12 Cross Street Preston United Kingdom PR1 3LT, England. Parker is the President of Hydroswing.

8. Plaintiff Beck's is a corporation incorporated under the laws of Indiana. Its principal place of business address is 6767 E. 276th Street, Atlanta, Indiana 46031.

9. The delivered hangar door parts and the airport hangar at the center of this action are located in Boone County, Indiana, Indianapolis Executive Airport, 11329 E. State Road 32, Zionsville, Indiana 46077.

10. This Court has diversity jurisdiction over this matter under 28 USC § 1332.

11. The amount in controversy exceeds $75,000, the jurisdictional amount under 28 USC § 1332(a).

12. Venue is proper in the Southern District of Indiana as the hangar door parts, the hangar, and the plaintiff are located in the Southern District.

## THE DOOR AGREEMENT

13. On or about February 10, 2015, Beck's and Hydroswing entered into a contract for Beck's to purchase and Hydroswing to supply a hydraulic airplane hangar door

(this contract is referred to as the "Door Agreement"). A copy of the Door Agreement is attached to this Complaint as Exhibit 1. The initial contract is called Quote #45983 and is dated December 7, 2014.

14. Beck's agreed to pay Hydroswing $381,000 for a hydraulic airplane hangar door measuring 110 feet by 28 feet (the "Hangar Door"). Hydroswing promised to provide and install the Hangar Door with laminated glass cladding.

15. The first version of the Door Agreement showed to Beck's indicated Beck's would pay $190,500 as a deposit and the other $190,500 "On Delivery." A copy of the first Door Agreement given to Beck's, dated November 24, 2014 and identified as Quote #45983, is attached as Exhibit 2.

16. Prior to obtaining signatures, Hydroswing altered the text of the Door Agreement and provided an altered version for Beck's to sign. This altered version was the same as the first version except "On Delivery" was changed to "On Dispatch," meaning Hydroswing would be paid 100% of the amount due without ever delivering any of the Hangar Door or components. This alteration to the payment terms was never discussed with Beck's, communicated by a written instrument, or explained with a red-line version.

17. Beck's signed the altered version of the Door Agreement.

18. Beck's paid $190,500 to Hydroswing on or about February 5, 2015, as reflected on Invoice 15/0204. A copy of this invoice is attached as Exhibit 3.

## HYDROSWING'S FAILURE TO TIMELY DELIVER THE HANGAR DOOR

19. Hydroswing promised to deliver the Hangar Door and begin installation on November 9, 2015.

20. In reliance on this promise, Beck's made arrangements to close Indy Executive Airport for installation and informed Hydroswing of this closure.

21. Beck's arranged for cranes to be available on November 9, 2015 for the Hangar Door installation. Beck's incurred costs to engage the cranes.

22. Hydroswing failed to deliver the Hangar Door on November 9, 2015 or the days immediately following.

23. Hydroswing failed to deliver the Hangar Door in December 2015.

24. As a consequence of the Hangar Door not being delivered, Beck's was forced to build a temporary wall in December of 2015 to protect the interior of the Beck's hangar against the winter elements. This temporary door was constructed at Beck's cost.

25. Because the Hangar Door was not delivered as promised and Beck's had already tendered Hydroswing $190,500, Beck's sought adequate assurances Hydroswing would perform under the Door Agreement. Beck's refused to tender any additional funds to Hydroswing until Beck's received adequate assurances.

## ESCROW AGREEMENT

26. In order to address Beck's request for adequate assurance of performance, the parties negotiated an escrow agreement (the "Escrow Agreement") to govern the final payment under the Door Agreement.

27. On or about January 29, 2016, Beck's, Hydroswing, and Lake City Bank, as escrow agent, entered into the Escrow Agreement. A copy of the Escrow Agreement is attached as Exhibit 4.

28. Beck's and Hydroswing agreed the remaining amount due under the Door Agreement ($190,500) would be escrowed with a third party to ensure both parties fulfilled their obligations. The funds would be released in stages upon confirmation of loading, delivering, and installing the Hangar Door at Indy Executive Airport.

29. Pursuant to the Escrow Agreement and communications between Beck's and Hydroswing, the door and all components were supposed to ship immediately upon signature of the Escrow Agreement.

30. On January 29, 2016, Beck's informed Hydroswing the Hangar Door needed to be installed in March or early April because of the winter weather, but the door could remain outside the hangar building until installation.

31. Parker indicated Hydroswing would begin loading on January 30, 2016.

32. The door frame arrived at Beck's on February 15, 2016. The hydraulic components still had not arrived as of June 28, 2016.

33. The first escrow payment ($50,000) was released on February 2, 2016 upon notification from Hydroswing that the Hangar Door and all components (except hydraulics) were loaded onto trucks and ready to be shipped to Indiana.

34. Beck's released the second escrow payment ($92,300) on February 15, 2016 when the steel frame for the door arrived on two trucks at Indy Executive Airport. The hydraulics, fasteners, and other window installation parts were not included.

35. The steel frames for the Hangar Door were damaged upon arrival, including numerous rust spots, significant scratches and other flaws in the paint.

36. A truck driver for the delivery company told Beck's that when he picked up the door pieces just over the Mexican border, the door pieces were chained together in the dirt.

37. The final escrow amount ($48,200) is still in the escrow account and held with Lake City Bank.

38. Pieces of the Hangar Door have been sitting on Beck's tarmac since February 15, 2016. Glass panes have been waiting to be installed since November 2015.

39. Hydroswing initially informed Beck's that installation would begin on March 23, 2016. On April 1, 2016, Parker informed Beck's that he would notify Beck's when the remaining components were ready to ship and then Hydroswing "will schedule your install immediately."

40. On or about April 13, 2016, Parker told Beck's the installation date would be "within a month," "hopefully sooner," and Hydroswing would provide a firm installation date by the following week.

41. The following week (April 21, 2016), Parker promised installation of the door would begin on May 21, 2016, not "within a month" as previously promised. Parker said Nelson Carrick from Hydroswing would follow up on April 22, 2016 with specifics.

42. Carrick emailed counsel for Beck's on April 22, 2016 indicating installation would begin on May 23, 2016, two days later than promised, and the frame installation would be completed by approximately May 29, 2016.

43. On April 28, 2016, Beck's informed Hydroswing that installation needed to begin by May 16, 2016 and be completed no later than May 22, 2016 because of the increased Indianapolis 500 airport traffic. Beck's informed Hydroswing that failure to complete the door installation by 11:59 p.m. on May 22, 2016 would be considered a breach of the Door Agreement and the Escrow Agreement.

44. Hydroswing made no attempt to install the door by May 22, 2016. Instead, on May 17, 2016, Parker promised Beck's installation of the Hangar Door would begin on May 31, 2016. Hydroswing confirmed the May 31, 2016 installation begin date by letter dated May 20, 2016.

45. Hydroswing did not begin installation of the Hangar Door on May 31, 2016. No installers or fabricators contacted Beck's to arrange installation.

46. Parker next promised installation would begin on June 6, 2016.

47. Hydroswing failed to begin installation of the Hangar Door on June 6, 2016.

48. Hydroswing's breaches of the agreements remain uncured.

### COUNT I: BREACH OF DOOR AGREEMENT, WARRANTIES, AND ESCROW AGREEMENT AGAINST HYDROSWING

49. Beck's incorporates the paragraphs above as if fully repeated here.

50. Beck's and Hydroswing entered into a contract in which Beck's agreed to purchase and Hydroswing agreed to produce, deliver, and install the Hangar Door at the Airport.

51. Beck's has fully performed under the Door Agreement and Escrow Agreement and has made all payments currently due.

52. Hydroswing promised to begin installing the Hangar Door on November 9, 2015.

53. Hydroswing did not begin installing the Hangar Door on November 9, 2015 as promised.

54. Beck's incurred additional costs because of Hydroswing's failure to install the Door in November 2015.

55. Beck's has been damaged because of Hydroswing's failure to install the Door in November 2015.

56. Hydroswing continues to be in breach of the Door Agreement because it has failed to install the Door.

57. Hydroswing has failed to install the Hangar Door within a reasonable time following delivery, causing Beck's inability to use the hangar and impacting Indy Executive Airport.

58. Upon information and belief, Hydroswing has failed to pay all subcontractors and suppliers for the Hangar Door.

59. Hydroswing's failure to install the Hangar Door and pay subcontractors and suppliers is a breach of the Escrow Agreement.

60. Hydroswing's delivery of the steel frame of the Hangar Door with rust and scratches constitutes a breach of the warranties in the Door Agreement.

**COUNT II: FRAUD IN THE INDUCEMENT AGAINST HYDROSWING AND PARKER**

61. Beck's incorporates the paragraphs above as if fully repeated here.

62. Hydroswing initially presented a Door Agreement that called for the second and final payment of $190,500 to be made "On Delivery."

63. Prior to obtaining signatures, Hydroswing materially altered the text of the Door Agreement by providing an altered version for Beck's to sign. Hydroswing failed to

communicate this material change with Beck's. This alteration to the payment terms was never discussed with Beck's, communicated by in a written instrument, or explained with a red-line document version.

64. Beck's reliance on Hydroswing's false statements caused Beck's to incur costs and suffer damages. The altered contract provided Hydroswing with negotiating leverage when it failed to deliver the Hangar Door as promised, leaving Beck's no alternative but to sign an escrow agreement and deliver additional funds to Hydroswing in order to get the door Beck's was promised.

## COUNT III: PROMISSORY ESTOPPEL AGAINST HYDROSWING

65. Beck's incorporates the paragraphs above as if fully repeated here.

66. In the course of negotiations after the Door Agreement was signed, Hydroswing made and broke numerous promises to Beck's. These promises stretched over the end of 2015 into the spring of 2016.

67. Hydroswing promised the Door would be shipped and ready for installation on November 9, 2015.

68. Hydroswing made this promise with the expectation Beck's would rely on it.

69. Beck's reasonably relied on Hydroswing's promises.

70. Beck's reliance was definite and substantial.

71. Injustice can only be avoided by enforcement of Hydroswing's promise.

72. Beck's incurred costs when it arranged to close the airport and obtain cranes for Hydroswing to install the Hangar Door. Beck's made these arrangements based on Hydroswing's promise it would install the door in November 2015.

73. Beck's incurred costs when it had to build a temporary protection wall to protect the hangar from the winter weather after Hydroswing failed to deliver and install the door as promised in November 2015.

74. Beck's incurred additional costs because it relied on Hydroswing's promise to deliver and install the Hangar Door beginning on November 9, 2015.

### COUNT IV: UNJUST ENRICHMENT AGAINST HYDROSWING

75. Beck's incorporates the paragraphs above as if fully repeated here.

76. In the event the Court determines the Door Agreement is unenforceable because it was procured by fraud or other means, Hydroswing has been unjustly enriched.

77. Hydroswing has kept the funds paid to it by Beck's but has not installed the Hangar Door.

78. The frame of the Hangar Door that was delivered is of no use to Beck's on its own.

79. Hydroswing has needlessly and unreasonably delayed installing the door.

80. Hydroswing's retention of the funds paid to it by Beck's is unjust.

### COUNT V: NEGLIGENCE AGAINST HYDROSWING

81. Beck's incorporates the paragraphs above as if fully repeated here.

82. In a contract for work, there is an implied duty to do the work skillfully, carefully, and in a workmanlike manner. Hydroswing owes this duty to Beck's.

83. Hydroswing holds itself out as the "Worlds [sic] Number One Hydraulic Door System" (http://hydroswing-hydraulic-doors.com, visited May 17, 2016). Parker claims Hydroswing offers "superior hydraulic door quality, advanced design, effective delivery and tremendous cost efficiency." (http://marshalparker.com, visited May 17, 2016).

84. Hydroswing breached its duty to Beck's.

85. Hydroswing's breach caused damages to Beck's, including but not limited to additional costs Beck's incurred to mitigate damages, lost use at the airport hangar, lost funds paid to Hydroswing, and other property damage and injury to Beck's.

## COUNT VI: BREACH OF PERSONAL GUARANTEES BY PARKER

86. Beck's incorporates the paragraphs above as if fully repeated here.

87. After Hydroswing failed to deliver the Hangar Door in November 2015, Beck's sought adequate assurance Hydroswing would perform.

88. In order to induce Beck's to proceed with the Door Agreement, Parker offered his personal guarantees Hydroswing would perform under the contract.

89. Parker made these guarantees in telephone conversations and in writing. For example, in an email dated January 5, 2016, Parker wrote that the Door Agreement was backed by "my personal guarantee to support Becks, Phil Ward and you, stands." A copy of Parker's personal guarantee is attached as Exhibit 5.

90. Beck's relied upon these personal guarantees when it decided to proceed with the Door Agreement.

91. Parker is liable for all of the debts and obligations of Hydroswing according to his personal guarantees.

## COUNT VII: DECLARATORY JUDGMENT

92. Hydroswing has not installed the door.

93. There is still $48,200 in the escrow account.

94. The remaining funds in the escrow account should be released back to Beck's.

95. Hydroswing must issue a letter to Lake City Bank in order for the bank to release the remaining funds to Beck's.

96. Beck's requests the Court issue an order commanding Hydroswing to direct Lake City Bank to release immediately the $48,200 remaining in the escrow account back to Beck's.

## PRAYER FOR RELIEF

Wherefore, Beck's requests this Court enter judgment against Hydroswing and Parker, and in Beck's favor, including:

(a) Awarding Beck's damages for the costs incurred from Hydroswing's delay;

(b) Awarding Beck's damages for the costs incurred from the installation of its own Hangar Door to complete Hydroswing's performance under the Door Agreement;

(c) Awarding Beck's damages from Hydroswing's fraud and negligence;

(d) Awarding Beck's damages from Hydroswing's and Parker's breach of contract, breach of warranty, breach of personal guarantee, and breach of escrow agreement;

(e) Ordering equitable relief under the theories of unjust enrichment and promissory estoppel;

(f) Issuing an order commanding Hydroswing to direct Lake City Bank to release the final $48,200 in the escrow account to Beck's;

(g) Ordering Hydroswing to refund Beck's the amounts paid to date for the Hangar Door;

(h) Awarding attorneys' fees and costs; and

(i) Awarding all other just and proper relief.

## JURY DEMAND

Beck's demands a jury trial for all counts so triable.

Respectfully submitted,

/s/ Brianna J. Schroeder
Todd J. Janzen, #23615-49
Brianna J. Schroeder, #28772-64
Janzen Agricultural Law LLC
8425 Keystone Crossing Suite 261
Indianapolis, IN 46240
janzen@aglaw.us
schroeder@aglaw.us
(317) 855-9920
